Sarah Grossman-Swenson, SBN #11979
Kimberley C. Weber, SBN #14434
McCRACKEN, STEMERMAN & HOLSBERRY
1630 South Commerce Street, Suite A-1
Las Vegas, Nevada 89102
Phone: (702) 386-5107
Fax:    (702) 386-9848
Email:  sgs@msh.law
        kweber@msh.law

*Attorneys for Plaintiff Carlos Hicks*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CARLOS HICKS, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TESLA, INC.; and DOES 1-10, | |
| Defendants. | |

COMPLAINT

# INTRODUCTION

1. Plaintiff Carlos Hicks ("Plaintiff" or "Mr. Hicks") brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII") against Defendant Tesla, Inc., dba Tesla Motors, Inc. (hereinafter "Tesla" or "Defendant") for racial discrimination and for retaliation he faced after raising concerns about sexual harassment in the workplace with Tesla Human Resources (HR).

2. Mr. Hicks was a promising employee at Tesla. He was hired as a temporary worker by Defendant in the Sparks, Nevada facility in June 2020 but became a full-time employee in November 2020. Mr. Hicks hoped to begin a lasting career with Tesla and worked hard to accomplish that goal. But Tesla did not maintain a work environment where Mr. Hicks or other Black employees could thrive, especially not Black employees who spoke up about discrimination at work.

3. Instead, Tesla fostered a culture that was permissive of racism and sexism. Management and co-workers routinely and casually used the n-word and other racial epithets, and they played loud music in communal spaces that used racially and sexually derogatory language. When Mr. Hicks' co-workers acted in ways that made it difficult for Black employees and women to feel comfortable at work, management made it clear that addressing such behaviors was far down on their list of priorities. When Mr. Hicks stood up for himself and his co-workers, he faced retaliation.

4. In or about November or December 2020, Mr. Hicks complained to HR about sexually-charged and inappropriate comments another employee made in a group message viewable by Mr. Hicks' team, and about the failure of Plaintiff's supervisor to address the comments. In retaliation, that supervisor issued Mr. Hicks a "needs improvement" review for offering "feedback" about his coworkers, even as he acknowledged that Mr. Hickswas a "bright young kid" who was "happy to focus on his work." He then made Mr. Hicks' life at Tesla extremely difficult.

5. Mr. Hicks' experience was part of a pattern and practice of discrimination at Tesla. Complaints about racial harassment, discrimination, and retaliation are ignored by Tesla. Management clearly had notice of the use of racist and sexist epithets, graffiti, and music in the Sparks facility. Tesla's failure to address the issues appeared to Mr. Hicks as a tacit endorsement of the conditions that made the workplace inhospitable to Black employees. Discriminatory mistreatment by certain

supervisors and the daily indignities he experienced weighed on Mr. Hicks. Bringing the problem to the attention of his superiors and to HR only exposed him to retaliation.

6. On information and belief, Tesla's CEO, Elon Musk, characterizes himself as a "free speech absolutist," a policy reflected in allegations that Tesla has failed to take remedial measures in response to consistent and repeated complaints about discrimination and harassment.[1] Mr. Musk has advised that Tesla workers should be "thick-skinned" about race harassment.[2] That attitude was adopted from the top-down by management at the Sparks facility, which approached issues of discrimination by ignoring the problem or portraying people like Mr. Hicks as confrontational or poor members of the team. His experiences and the company culture made it apparent that complaining was futile and discouraged Mr. Hicks from seeking help.

7. Despite Tesla's failure to address any of the problems that made the workplace hostile to Mr. Hicks' growth, he tried to persevere. He sought training to develop the skills he needed to succeed and looked for opportunities to advance. Two supervisors who directly oversaw Mr. Hicks during his tenure at Tesla saw his potential and acknowledged his dedication to his work. But Mr. Hicks was continuously held back by the retaliatory performance review that he had received from his direct supervisor in January 2021.

8. Mr. Hicks lost promotions due to the retaliatory review. Eventually, the work environment became so hostile that Mr. Hicks was forced to resign and abandon his dream of working at Tesla.

**PARTIES, JURISDICTION & VENUE**

9. Plaintiff Carlos Hicks is, and at all relevant times was, a Black and Hispanic adult male.

---

[1] David Klepper, Report: Tweets with Racial Slurs Soar Since Musk Takeover, Nov. 10, 2022, https://apnews.com/article/elon-musk-technology-business-government-and-politics-2907d382db132cfd7446152b9309992c [accessed May 23, 2023]; Faiz Siddiqui, Judge Denies Tesla's Bid to Move Sexual Harassment Case to Arbitration, https://www.washingtonpost.com/technology/2022/05/24/tesla-sexual-harassment-case/, May 24, 2022 [accessed May 23, 2023].

[2] In an email to workers in 2017, Elon Musk, Tesla's Chief Executive Officer, warned against "being a huge jerk" to members of "a historically less represented group." At the same time, he wrote, "if someone is a jerk to you, but sincerely apologizes, it is important to be thick-skinned and accept that apology." Sam Levin, She Took on Tesla for Discrimination. Now Others Are Speaking Up. 'It's Too Big to Deny', Jul. 5, 2017, https://www.theguardian.com/technology/2017/jul/05/tesla-sexual-harassment-discrimination-engineer-fired?CMP=share_btn_tw [accessed May 23, 2023].

1  During his employment with Tesla, he was a resident of Nevada. He is currently a resident of Oregon.

2       10.     Plaintiff was employed by Defendant in Sparks, Nevada. Defendant's conduct at all
3  relevant times occurred in Sparks, Nevada and/or in its principal place of business in Palo Alto,
4  California.

5       11.     Defendant Tesla is a Delaware corporation that had its principal place of business at all
6  relevant times in Palo Alto, California. Tesla moved its principal place of business to Austin, Texas on
7  December 1, 2021. Defendant designs, develops, manufactures, tests, markets, distributes, sells, and
8  leases electric vehicles under the brand name "Tesla." Defendant was at all relevant times an employer
9  as defined in Section 701(b) of Title VII.

10      12.     Defendants DOES 1 through 10 are sued under fictitious names because their true
11 names and capacities are unknown at this time. Plaintiff will amend this Complaint to allege DOE
12 Defendants' true names and capacities when ascertained. Plaintiff is informed and believes and
13 thereupon alleges that at all material times herein, each Defendant named herein, including DOES 1
14 through 10, acted as the agent, employee, supervisor, joint venture, representative, and/or alter ego of
15 or for the other Defendants; all aided and abetted the wrongful acts of the others; and all are subject to
16 the jurisdiction and venue of this Court. In doing the things herein alleged, each and every Defendant
17 was acting within the course and scope of this agency or employment and was acting with the consent,
18 permission, and authorization of each of the remaining Defendants. All actions of each Defendant
19 were ratified and approved by the officers or managing agents of every other Defendant.

20      13.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1343.
21 Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.* This
22 Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 1331 and 1343(a)(4). The Court has
23 supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims under the Nevada Fair
24 Employment Practices Act, Nev. Rev. Stat. §613.330.

25      14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part
26 of the events or omissions giving rise to the claim occurred in this District.

27                **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**
28      15.     In or about June 2020, Defendant hired Mr. Hicks through a staffing company as a

temporary worker in its Sparks, Nevada warehouse. Mr. Hicks became a full-time Material Handler at Tesla in November 2020. Even when he was first hired, Mr. Hicks looked for opportunities to progress at Tesla.

### Actions and Omissions by Tesla Management Contributed to a Hostile Work Environment for Black Employees

16. From the beginning of his employment, Mr. Hicks and other Black workers were subjected to hearing racial epithets in the workplace. Mexican American and white managers loosely used the n- word to address one another in the Sparks, Nevada Tesla facility. Managers made no effort to reprimand white employees when they used the n-word in front of managers and Black employees, including Mr. Hicks.

17. Tesla permitted racially-charged graffiti at the Nevada warehouse in commonly shared spaces, such as in elevators, booths, and bathrooms.

18. Managers used these spaced and could see the racist vandalism, but did nothing about it. Mr. Hicks found words and phrases like "nazi," "bring slavery back," and the n- word, and drawings of swastikas, confederate flags, and sexual drawings that were never removed throughout the duration of his employment. These images were in areas heavily used by management.

19. Tesla also allowed managers and sometimes employees to play their own music at work stations through auxiliary speakers. Many songs were profane and used racist and offensive words like the n- word, "bitch," "ho" and similar words. This language was accepted without question by managers in the workplace. Everyone within at least 60 feet of the work area could hear this music, including new hires and more senior managers within the company whenever they walked the production floor. At no point while Mr. Hicks worked at Tesla did leadership provide any rules or restrictions on the music that was played.

20. Mr. Hicks and other Black employees were routinely made to work in unfavorable and unsafe work areas, while less physically straining work was given to non-Black workers. Mr. Hicks was forced to work overtime outside of his usual area.

21. Mr. Hicks was afraid that if he complained about the racial harassment at work, that he would be retaliated against because he was a Black man. It was clear to Mr. Hicks that complaining

about the racism pervading the workplace would be futile because so many managers witnessed the racist remarks, graffiti, and music, and did not say anything to stop of any of it.

### Retaliation for Reporting Sexual Harassment

22. Tesla uses internal group messaging to communicate information from management to employees and for employees to communicate with each other and their supervisors. Mr. Hicks and his co-workers were part of a group message thread that was viewable by his direct supervisor, David Perez. In or about September 2020, a co-worker shared a message with the group that he needed a break. Another co-worker, Mark Gonzalez, responded: "And I need a hug from a cute redhead girl. Never hugged a redhead before. If I can't have one then you can't have a break." There was only one woman who worked on their team; she had red hair and identified as a lesbian. Mark also wrote later on the group chat: "1st floor needs to be heated. My skin is as dry as a lesbian's tongue." Supervisor David Perez then wrote in response to Mark's posting, "Mark … come see me at f2 buffer please." He did not write anything on the chat stating that this language was unacceptable or otherwise follow-up publicly. Mark responded, "Uh oh. Omw [on my way]".

23. Mr. Hicks was uncomfortable being a bystander to sexual harassment targeting his female co-worker. He was also concerned that his supervisor Mr. Perez failed to indicate that Tesla had any policy regarding inappropriate sexual language in the workplace, or even that Defendant disapproved of this behavior. He did not say anything immediately because it felt futile and he was worried about retaliation. On further reflection, however, he felt like he had to speak up.

24. In or about November or December 2020, Mr. Hicks complained to HR about the comments that Mark had made, and about Defendant's failure to ensure that employees would not publish sexually explicit or derogatory comments about employees' gender or sexual orientation to group messages in the future.

### Retaliation & Denial of Advancement Opportunities

25. Mr. Perez resented that Mr. Hicks had complained to HR regarding his concerns. Shortly following Mr. Hicks' complaint to HR, in January 2021, Mr. Perez gave Mr. Hicks a negative performance review, indicating that he "needs improvement."

26. However, the review did not criticize Mr. Hicks' performance of his job duties. Instead,

Mr. Perez essentially criticized Mr. Hicks for not being one of the guys and fitting in. Mr. Perez specifically complained about Mr. Hicks providing "feedback" about other team members. Mr. Perez wrote: "Carlos does not really socialize with other members of the team. In the past, he has had some confrontation, or feedback, for at least half the members of the team on second floor. Initially stemming from apparent favoritism and then lately towards apparent unbalanced feedback on mine and my leads part of the team." Mr. Perez admitted that Mr. Hicks was doing his job and meeting the basic requirements of his position, and that he was a "bright young kid" but said that he was "not interested in engaging with the team, rather happy to focus on his work and not be bothered." Mr. Hicks had met his job requirements, but he had failed to adapt to the company culture of not providing "feedback" about harassment and discrimination. His supervisor was apparently enforcing the CEO's directive that employees should be "thick-skinned" as a response to harassment and discrimination.

27. Performance reviews are strictly interpreted by Tesla and its employees: a review that an employee has not "me[t] expectations" forecloses that employee from advancement. By remarking that Mr. Hicks' performance "need[ed] improvement" on his January 2021 review, Mr. Perez prevented Mr. Hicks from becoming eligible for promotion during the January – June 2021 time period.

28. The January 2021 performance review directly impacted Mr. Hicks' opportunity for advancement. Mackenzie Wright, an internal recruiting coordinator for Tesla, later admitted to Mr. Hicks that he was being denied promotions because of the negative performance review. She wrote to Mr. Hicks: "You should have received an email stating you were deemed not eligible for internal mobility. The reason listed per HR was listed as 'Needs Improvement score on last performance review'." Mr. Hicks did not receive such an email, and he was repeatedly turned down for promotions.

29. After receiving the negative performance review, Mr. Hicks asked Mr. Perez for coaching to "directly address and correct these work performance concerns." Mr. Perez did not respond. Mr. Perez sent Mr. Hicks to unfavorable areas of the warehouse while working overtime, while white coworkers, and other co-workers who had not raised complaints about sexual harassment, were permitted to remain in their normal work areas during overtime.

30. Working under Mr. Perez became so intolerable that in February 2021, Mr. Hicks asked

to switch from the D shift to the C shift. Mr. Hicks knew he would be paid less on the C shift, but was willing to take lower pay in exchange for better treatment and working conditions under a different supervisor.

31. Feedback that Mr. Hicks received from other supervisors clearly indicates that the January 2021 review was retaliatory, and did not reflect Mr. Hicks' abilities as an employee. After Mr. Hicks made the switch to the C shift, other supervisors recognized that Mr. Hicks was a promising worker. Terrell Williams, an Associate Manager in Production Control at Tesla and a Black man, wrote on April 21, 2021, "Very articulate and eloquent, Carlos's potential is limitless. Looking forward to watching your growth."

32. In May 2021, Mr. Hicks asked Gloria Karna, his new supervisor on C shift, for assistance in addressing the negative remarks Mr. Perez had given him in his January 2021 performance review. Ms. Karna, a woman of color, responded to Mr. Hicks' request on May 3. Referring to the negative performance review provided by Mr. Perez, Ms. Karna said: "I am not able to validate this review. Carlos is very meticulous, detail oriented, and offers ideas for improvement in each area he's assigned. It just so happens, w[h]ere the leads have asked Carlos to work, that area is shining and improved. I will be scheduling 1X1's with all associates and happy to set aside extra time to address any concerns Carlos may have. I believe Carlos has a bright future here at Tesla."

33. The positive feedback that Mr. Williams and Ms. Karna, a Black man and a woman of color, gave Mr. Hicks was apparently disregarded and carried no weight with Tesla. Despite Ms. Karna's review directly refuting the validity of Mr. Perez's January 2021 comments, the negative review remained in Mr. Hicks' file, and continued to limit his opportunities for formal advancement. At the same time, Mr. Hicks was given increased job responsibilities, performing inventory control tasks, while still being compensated as a material handler.

34. Mr. Hicks applied for and was denied opportunities for promotion. He was informed that the lack of promotion was due to Mr. Perez's retaliatory negative performance review.

35. A causal link exists between the protected activity and the adverse action because Mr. Perez made clear that he was giving Mr. Hicks a negative review because of his protected activity, criticizing Mr. Hicks for providing "feedback" about other team members, and for failing to "socialize"

with co-workers. Even when Mr. Hicks challenged the negative review and other supervisors provided positive feedback about Mr. Hicks, saying they could not "validate" the negative review, and that Mr. Hicks was actually an excellent employee, Tesla refused to change the negative review. This prevented Mr. Hicks from being promoted during a six-month period when he was actively seeking promotion, which is an adverse employment action.

36. Mr. Hicks repeatedly requested on-the-job training that he needed in order to safely operate the forklift. This was repeatedly denied.

37. This denial was also part of a pattern and practice of ignoring safety concerns. Tesla frequently staged inventory without leaving adequate space for employees to walk. In or about May 2021, Mr. Hicks raised safety concerns with HR. HR promised to investigate the issues but it resulted in no improvement. In June 2021, one of Mr. Hicks' co-workers fell between parts that were staged too closely together and cut himself badly enough to require stitches.

38. In response to Mr. Hicks' request for on-the-job forklift training, Mr. Hicks was ridiculed and subjected to abusive treatment by Supervisor Paul Daniels. Mr. Daniels appeared to have racially-motivated aggression toward Mr. Hicks. Mr. Daniels was a military veteran and biker with visible tattoos on his neck portraying skulls and hell-related imagery.

39. Mr. Daniels yelled at Mr. Hicks about his request for training on the forklift, treating him with aggression that was not shown by Mr. Daniels to Mr. Hicks' non-Black co-workers. Mr. Daniels called Mr. Hicks a "smart ass mf" and said, "lucky we're at work, I'm from fucking Cali," which Mr. Hicks took as the physical threat that it was no doubt intended to be. Mr. Hicks reported this to HR as well, but HR again failed to act.

40. Tesla invited Mr. Hicks and other Black employees to apply for higher positions, but it was clear that the Defendant was more concerned about appearing to cover its bases than actually encouraging its Black employees' growth. White co-workers who were less qualified than Black applicants routinely got the jobs based on their personal relationships with managers outside of work.

41. Patterns of disregard for the safety and comfort of its Black employees, and direct targeting by supervisors based on his race, made working at Tesla unwelcoming and miserable for Mr. Hicks. There are very few Black employees at Tesla, and Mr. Hicks feared retaliation if he pushed

harder on HR to address the issue of pervasive racism Defendant allowed to manifest and to which Defendant directly contributed.

### Threats for Taking Medical Leave

42. In July 2021, Mr. Hicks was in a serious car accident while on his way home from work. He provided all required and requested medical documentation to his employer, and he was out of work while he was waiting to hear back from his employer about his efforts to return to work. Tesla badly mismanaged Mr. Hicks' medical leave situation. Instead of getting back to him about accommodations, Tesla's HR department emailed him to state that because he had not reported to work for over two weeks, they would be terminating him for job abandonment. Even as he was recovering from the accident, Mr. Hicks had to struggle against Tesla leadership to make them acknowledge that he had already been placed on leave by someone else in HR. Tesla eventually recognized that it was a failure of communication by management, not by Mr. Hicks, that led to the confusion, and agreed not to terminate him for job abandonment as he healed from his accident.

### Forced Resignation

43. After repeated attempts to communicate with HR about ongoing workplace issues, it became clear that HR was not interested in seriously addressing the unfair and discriminatory treatment Mr. Hicks and other Black workers faced every day at Tesla. Mr. Hicks continued to be impacted by Mr. Perez's retaliatory performance review that kept him from advancement, and was fed up that there was no resolution to the safety issues he brought to Tesla's attention. The policy at Tesla seemed to be that discrimination and retaliation would be tolerated, and if an employee had anything to say about it, it was their fault for not having the "thick-skin" necessary to fit in with company culture.

44. Mr. Hicks resigned in August 2021 because working conditions were intolerable and he could see no path forward at the company.. In his resignation, Mr. Hicks explained that he felt it had become unsafe to work due to the mental and emotional distress caused by Tesla's retaliation, and was concerned that Tesla did not take his safety concerns or his concerns about sexual and racist remarks made by management and employees seriously.

//

//

## FIRST CLAIM FOR RELIEF

### Racial Discrimination in Violation of 42 U.S. Code § 2000e–2(a)&(d)

45. Plaintiff hereby incorporates by reference Paragraphs 1 through 44 inclusive of this Complaint as if fully set forth herein.

46. At all times herein mentioned, 42 U.S.C. § 2000e-2 was in force and binding.

47. The foregoing conduct violates Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e)-2(a)&(d).

48. Mr. Hicks was discriminated against because he was a Black employee at Tesla. Racism against Black employees was pervasive at Tesla and permeated Mr. Hicks' entire employment experience. Managers and supervisors routinely permitted racist graffiti and language. At all relevant times, Mr. Hicks was an excellent employee, who was told by managers of color that he had a "bright future" and "limitless potential" at Tesla. However, the perspective of those managers was discounted because of Mr. Hicks' race. He was discriminated against because he was a Black employee who dared to speak up and complain about sexism in the workplace. Tesla denied Mr. Hicks promotion, forced him to transfer to another position with lower pay to avoid a retaliatory supervisor, and denied Mr. Hicks on-the-job training, all of which constitutes race-based discrimination, in violation of 42 U.S.C. § 2000e-2(a) & (d).

49. Mr. Hicks received a Right to Sue letter from the EEOC on February 28, 2023, attached hereto as Exhibit 1, and has commenced this action in a timely manner. Accordingly, he has exhausted his administrative remedies.

50. Tesla's discriminatory employment practices described above have resulted in a loss of past and future wages for Mr. Hicks, and he requests relief as set forth below.

51. On information and belief, Tesla has engaged in a pattern and practice of intentional discrimination against Black employees.

52. Tesla has acted with malice or reckless indifference to the rights of its Black employees, including Mr. Hicks. Mr. Hicks is thus entitled to recover punitive damages in an amount to be determined according to proof.

//

**SECOND CLAIM FOR RELIEF**

**Racial Harassment in Violation of 42 U.S. Code § 2000e**

53. Plaintiff hereby incorporates by reference Paragraphs 1 through 52 inclusive of this Complaint as if fully set forth herein.

54. At all times herein mentioned, 42 U.S.C. § 2000e was in force and binding.

55. The foregoing conduct violates Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e).

56. Racism against Black employees was severe and pervasive at Tesla and permeated Mr. Hicks' entire employment experience. Managers and supervisors routinely permitted racist graffiti and language throughout the duration of Mr. Hicks' employment. The racial harassment was so severe and pervasive that it created a hostile and offensive work environment, and resulted in adverse employment decisions. Due to the hostile work environment, Mr. Hicks was forced to terminate his employment, resulting in a loss of past and future wages.

57. Tesla has engaged in a pattern and practice of permitting a hostile, offensive, and abusive work environment for Black employees. Tesla has acted with malice or reckless indifference to the rights of its Black employees, including Mr. Hicks. Mr. Hicks is thus entitled to recover punitive damages in an amount to be determined according to proof.

**THIRD CLAIM FOR RELIEF**

**Retaliation in Violation of 42 U.S.C. § 2000e-3(a)**

58. Plaintiff hereby incorporates by reference Paragraphs 1 through 57 inclusive of this Complaint as if fully set forth herein.

59. At all times herein mentioned, 42 U.S.C. § 2000e-3(a) was in force and binding.

60. The foregoing conduct violates Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e)-3, *et seq*.

61. At all relevant times, Mr. Hicks was performing his job satisfactorily. He was retaliated against after complaining of sexual harassment of a co-worker at work. The denial of promotion, the forced transfer to another position with lower pay to avoid a retaliatory supervisor, and the denial of opportunities for on-the-job training constitutes retaliation for protected activity, in violation of 42

U.S.C. § 2000e-3(a).

62. Mr. Hicks received a Right to Sue letter from the EEOC and has commenced this action in a timely manner. Accordingly, he has exhausted his administrative remedies.

63. Tesla's discriminatory employment practices described above have resulted in a loss of past and future wages for Mr. Hicks, and he requests relief as set forth below.

### FOURTH CLAIM FOR RELIEF

### Violation of Nev. Rev. Stat. § 613.330 - Discrimination

64. Plaintiff hereby incorporates by reference Paragraphs 1 through 63 inclusive of this Complaint as if fully set forth herein.

65. At all times herein mentioned, Nevada Revised Statute section 613.330 was in force and binding. The foregoing conduct violates the statute.

66. Mr. Hicks was discriminated against because he was a Black employee at Tesla. Racism against Black employees was pervasive at Tesla and permeated Mr. Hicks' entire employment experience. Managers and supervisors routinely permitted racist graffiti and language. At all relevant times, Mr. Hicks was an excellent employee, who was told by managers of color that he had a "bright future" and "limitless potential" at Tesla. However, the perspective of those managers was discounted because of Mr. Hicks' race. He was discriminated against because he was a Black employee who dared to speak up and complain about sexism in the workplace. Tesla denied Mr. Hicks promotion, forced him to transfer to another position with lower pay to avoid a retaliatory supervisor, and denied Mr. Hicks on-the-job training, all of which constitutes race-based discrimination.

67. Mr. Hicks received a Right to Sue letter from the EEOC which was cross-filed with the Nevada Equal Rights Commission, and he has commenced this action in a timely manner. Accordingly, he has exhausted his administrative remedies pursuant to Nev. Rev. Stat. § 613.430.

68. Tesla's discriminatory employment practices described above have resulted in a loss of past and future wages for Mr. Hicks, and he requests relief as set forth below.

69. On information and belief, Tesla has engaged in a pattern and practice of intentional discrimination against Black employees.

70. Tesla has acted with malice or reckless indifference to the rights of its Black employees, including Mr. Hicks. Mr. Hicks is thus entitled to recover punitive damages in an amount to be determined according to proof.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for the following relief:

1. All damages Plaintiff has sustained as a result of Defendant's conduct, including back pay, front pay, general and specific damages for lost compensation and job benefits they would have received but for the discriminatory practices of Defendant, according to proof;

2. Punitive and exemplary damages in amounts consistent with the law;

3. That Defendant be ordered to cease and desist from its unlawful employment practices permitting racist graffiti and language in its warehouses, and a declaratory judgment that such employment practices as unlawful under 42 U.S.C. § 2000(e), Title VII of the Civil Rights Act of 1964;

4. For prejudgment interest to the extent permitted by law;

5. For costs and expenses of suit incurred, including reasonable attorneys' fees, to the extent permitted by law; and

6. For such other legal and equitable relief as the Court may deem just and proper.

DATED: May 26, 2023                    Respectfully Submitted,
                                       **McCRACKEN, STEMERMAN & HOLSBERRY**

                                       */s/ Sarah Grossman-Swenson*
                                       Sarah Grossman-Swenson, SBN #11979
                                       Kimberley C. Weber, SBN #14434
                                       McCRACKEN, STEMERMAN & HOLSBERRY
                                       1630 South Commerce Street, Suite A-1
                                       Las Vegas, Nevada 89102
                                       Phone: (702) 386-5107
                                       Fax:    (702) 386-9848
                                       Email: sgs@msh.law
                                                 kweber@msh.law

                                       *Attorneys for Plaintiff Carlos Hicks*

13
COMPLAINT

Exhibit 1 to Complaint

EEOC Form 161-B (01/2022)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Carlos Hicks<br>2211 South West 4th Avenue # 517<br>Portland, OR 97201 | From: | San Francisco District Office<br>450 Golden Gate Avenue 5 West, PO Box 36025<br>San Francisco, CA 94102 |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 550-2022-00161 | **DAVID BRANNEN,**<br>**SENIOR INVESTIGATOR** | **(650) 684-0912** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

　　　More than 180 days have passed since the filing of this charge.

　　　The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA):* You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

　　　　　　　　　　　　　　　　　　　On behalf of the Commission

　　　　　　　　　　　　　　　　　　　February 28, 2023 - *Scott Doughtie*

Enclosures(s)　　　　　　　　　　　　　FOR:  **Nancy Sienko**
　　　　　　　　　　　　　　　　　　　　　　　 **District Director**


cc:　**M. Yusuf Mohamed**
　　**TESLA, INC.**
　　**Attn: Legal Department**
　　**901 Page Ave**
　　**Fremont, CA 94538**

　　**Jake Hadgraves**
　　**TESLA**
　　**1333 H Street NW**
　　**Washington, DC 20005**

　　**John M Russell**
　　**RUSSELL, OLIVER & STEPHENS, PLC**
　　**5178 Wheelis Drive, Suite 1**
　　**Memphis, TN 38117**

　　**Sarah  Grossman-Swenson**
　　**McCracken, Stemerman & Holsberry, LLP**
　　**595 Market Street, Suite 800**
　　**San Francisco, CA 94105**

Exhibit 1
1-1

Enclosure with EEOC
Form 161-B (01/2022)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

**Exhibit 1**
**1-2**